IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

NICOLE SIMONSON,

                        Plaintiff,                                OPINION and ORDER

        v.

IQ DATA INTERNATIONAL, INC.,                                        22-cv-215-jdp

                        Defendant.

---

Plaintiff Nicole Simonson was the victim of identity theft. Someone using her name and other personal information rented an apartment in Arizona (Simonson lives in Wisconsin) and then failed to pay nearly $6,000 in rent. The company that owned the apartment hired defendant IQ Data International, Inc. to collect the debt. When Simonson saw the debt on her credit report, she informed IQ Data and the credit reporting agencies about the identify theft. In response, IQ Data designated the debt as disputed, but it refused to stop reporting the debt. Simonson alleges that the false debt made it more difficult to get a student loan, required her to expend unnecessary time and effort to correct her credit report, and caused her emotional distress. She is suing IQ Data under both the Fair Credit Reporting Act (FCRA) and the Fair Debt Collections Practices Act (FDCPA), contending that IQ Data failed to reasonably investigate her claim of identity theft and either knew or should have known that the debt was not hers.

IQ Data moves for summary judgment on all of Simonson's claims, contending that it acted reasonably by sending Simonson a letter asking for proof of residence, and it was not required to do more when Simonson didn't respond to that letter. Simonson denies that she received the letter, and she blames IQ Data for not addressing the letter properly. She also says

that IQ Data failed to respond meaningfully when she continued disputing the debt and provided more information. She seeks summary judgment on the question whether IQ Data acted reasonably.

The court will deny Simonson's motion and deny IQ Data's motion in large part. Questions about a defendant's reasonableness in a consumer-law case like this one are generally reserved for the jury, and this case is not one of the exceptions. A reasonable jury could find that IQ Data satisfied its obligations by asking Simonson for proof of her address, but a reasonable jury could also find that IQ Data should have done more when it received more information. The court will grant IQ Data's motion for summary judgment as it relates to Simonson's request for punitive damages because Simonson didn't respond to IQ Data's argument about that issue in her brief.

UNDISPUTED FACTS

The following facts are undisputed.[1]

IQ Data is a collection agency. Sometime in 2021, Montana Apartments in Phoenix, Arizona hired IQ Data to collect $5,639.86 in unpaid rent and other charges from a person who identified herself as Nicole Simonson. In fact, the debtor was not Simonson, who lives in Wisconsin. The debtor had used Simonson's name and other personal information when applying for the apartment lease.

---

[1] Simonson purports to dispute many of IQ Data's proposed findings of fact on the ground that they rely on a declaration that is not "signed under penalty of perjury." *See* Dkt. 39. But the declaration at issue is signed and states that it was made under penalty of perjury in accordance with 28 U.S.C. § 1746, Dkt. 33, so the court will disregard any of Simonson's disputes that are based on that alleged defect.

2

On April 6, 2021, a representative from IQ Data called Simonson about the debt. Simonson told IQ Data that she had never lived in Arizona and was the victim of identity theft. The representative told plaintiff to send IQ Data a written dispute and to include the police report. The same day, IQ Data reported to the credit agencies that the debt attributed to Simonson was disputed. Simonson did not comply with IQ Data's request for four months.

On July 1, a representative from IQ Data called both the debtor and Simonson. (The parties don't explain how IQ Data obtained the debtor's phone number but presumably the number was provided by Montana Apartments.) When speaking with Simonson, the representative said that she did not sound like the person he had spoken to earlier in the day, who also identified herself as Nicole Simonson.

In August 2021, Simonson disputed the debt with Equifax, Experian, and TransUnion. At that point, Experian and TransUnion removed the debt from Simonson's credit report, but Equifax did not. IQ Data continued reporting the debt to Equifax as disputed.

On August 9, Simonson mailed a letter to IQ Data using the letterhead of her employer, which was located in Duluth, Minnesota, near the Wisconsin border. In the letter, Simonson repeated her statement that she had been the victim of identity theft, and she provided a copy of the incident report prepared by the Phoenix Police Department.[2] The report consists primarily of a statement from Simonson that she was the victim of identity theft. The statement includes possible phone numbers and addresses of the debtor.

On August 13, IQ Data received Simonson's letter. In response, IQ Data prepared a letter in which it asked Simonson to provide three things: (1) a police report with the name

---

[2] The letter is dated August 2, Dkt. 33-2, at 2, but the parties agree that Simonson mailed the letter on August 9, Dkt. 43, ¶ 27.

and telephone number of the officer involved; (2) a copy of a valid government issued identification card (such as a driver's license), and (3) "proof of residency during the time the alleged fraud or identity theft occurred (copy of a rental/lease agreement in your name, a utility bill, or an insurance bill)." Dkt. 33-3. IQ Data sent the letter to the address included on Simonson's letter, which was the address of her employer, except that IQ Data did not include the employer's suite number. The letter was addressed to "Nicole Simonson c/o Trial Group North Law Firm." Simonson did not receive the letter.

On August 21, September 4, and November 21, Simonson sent more disputes to Equifax about the Montana Apartments debt. The November dispute included Simonson's driver's license and a copy of a police report that Simonson filed in Douglas County, Wisconsin about the identity theft.

In January 2022, IQ Data asked for and received a copy of the lease, ledger, and rental application from Montana Apartments. In February 2022, after reviewing these documents, IQ Data reported to Equifax that the account information was "accurate but disputed because it did not have proof of residence during the relevant time period and the driver's license was issued in 2016." Dkt. 33, ¶ 28.[3]

On February 14, 2022, Simonson submitted another dispute to Equifax, this time including an "identity theft affidavit" signed under penalty of perjury. The affidavit included the same address that was on Simonson's driver's license. Simonson has not provided any other details about the content of the affidavit, and she did not file a copy of the affidavit with the court.

---

[3] IQ Data did not submit a copy of the letter. The quoted language is from the declaration of an IQ Data employee.

In June 2022, Montana Apartments informed IQ Data that it did not have any "ID documents" from the debtor. Dkt. 38-6, at 3–4. The parties don't explain why Montana provided that information or what IQ Data did with it, if anything.

Simonson's law school denied her request for financial aid in January 2022 and May 2022, citing as the reason an "account in collection" on Simonson's Equifax credit report. In January 2022, Simonson paid her tuition out of pocket. In May 2022, she obtained financial aid after her husband co-signed the loan. During the three previous years, Simonson had obtained financial aid without a co-signer.

As a result of the time that Simonson spent disputing her account, she had to work "extended hours" at her job as a paralegal. Dkt. 43, ¶ 62.

IQ Data is no longer reporting the account to the credit reporting agencies. Dkt. 44, ¶ 28. IQ Data does not say when it stopped reporting the debt or why.

ANALYSIS

Simonson is asserting claims against IQ Data under the FCRA for failing to reasonably investigate her claim of identity theft and under the FDCPA for reporting a false debt. IQ Data seeks summary judgment on both claims on the ground that Simonson wasn't injured and didn't suffer damages. IQ Data also moves for summary judgment on the FCRA claim on the ground that its investigation was reasonable, and it moves on the FDCPA claim on the grounds that it didn't know Simonson's debt was false, and it acted in good faith. IQ Data also moves on Simonson's request for punitive damages. For her part, Simonson moves for summary judgment on her FCRA claim.

On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). The court will first consider IQ Data's contention that Simonson wasn't harmed and then move on to the merits of each claim.

## A.  Standing and compensatory damages

IQ Data contends that Simonson hasn't adduced evidence that she has standing to sue or that she suffered actual damages. The two issues are closely related, so the court will consider them together.

To have standing, a plaintiff must show that she suffered an "injury in fact" that is fairly traceable to the defendant's conduct and likely to be redressed by a judgment in the plaintiff's favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). To recover compensatory damages under the FDCPA or the FCRA, the plaintiff must show that the defendant's conduct was a substantial factor in causing a loss to the plaintiff. *Humphrey v. Navient Solutions, Inc.*, 473 F. Supp. 3d 889, 896 (W.D. Wis. 2020); *Scheel-Baggs v. Bank of America*, 575 F. Supp. 2d 1031, 1043 (W.D. Wis. 2008).

Simonson identifies three types of alleged harm that she suffered: (1) challenges in getting credit; (2) lost time; and (3) emotional distress. IQ Data contends that none of these alleged injuries provide a basis for standing or damages.

### 1. Credit denials

As for Simonson's difficulties in getting credit, it's undisputed that Simonson's law school denied her a student loan in January and May 2022. A denial of credit is an injury in fact for the purpose of showing standing. *See, e.g., Rydholm v. Equifax Information Services LLC,* 44 F.4th 1105, 1108 (8th Cir. 2022); *Moore v. United States Department of Agriculture on Behalf of Farmers Home Administration,* 993 F.2d 1222 (5th Cir. 1993); *see also TransUnion LLC v. Ramirez,* 141 S. Ct. 2190, 2211 (2021) (assuming that denial of credit is an injury for standing purposes). IQ Data doesn't argue otherwise, but it says that Simonson doesn't have evidence of a causal connection between the Montana Apartments debt and the denial of credit. The court disagrees. The emails that Simonson received from her school state that the denial was based on an "account in collection," and Simonson testified that she had been able to obtain student loans in the years before IQ Data reported the past-due debt. That's enough to allow a reasonable jury to find a causal connection between the Montana Apartments debt and the credit denial.

In one paragraph, IQ Data lists five reasons for why it believes Simonson doesn't have sufficient evidence of a causal connection: (1) Simonson testified that she didn't know what factors her law school's financial aid office used when reviewing student loan applications; (2) the credit denials may not have been tied to IQ Data because Simonson has "an extensive financial history involving a mortgage, home equity loans, student loans, credit cards, and a bankruptcy," Dkt. 29, at 9; (3) Simonson had been denied credit before 2021; (4) Simonson may have had another account in collections when she applied for a student loan; and (5) Simonson ultimately "secure[d] the funding" she needed for school, Dkt. 29, at 10. IQ

Data doesn't develop an argument in support of any of these reasons, and the court isn't persuaded that any of them provide a basis for granting summary judgment to IQ Data.

As for IQ Data's first reason, it doesn't matter what Simonson knew about the internal processes of her law school's financial aid office. As already noted, the law school informed Simonson in an email that her loan request was denied because an account was in collections. IQ Data doesn't challenge the admissibility of that email as a business record.

IQ Data's second and third reasons are about financial issues that Simonson had in the past, including other credit denials and a bankruptcy. But these issues predated the events relevant to this case, some of them by many years. The credit denials were in 2016 and 2017, and the bankruptcy was in 2005. Regardless of Simonson's credit history, a reasonable jury could infer that the Montana Apartments debt made the difference in getting credit because she obtained student loans before IQ Data began reporting the debt and she was denied a loan afterwards.

As for IQ Data's fourth reason–that Simonson may have had other accounts in collections when she was denied financial aid–IQ Data relies solely on equivocal testimony from Simonson. Specifically, Simonson testified that "it's possible that there was another [past-due] account at the time, but I only recall it being the I.Q. Data one." Dkt. 32 (Simonson Dep. 149:5–22). IQ Data submitted no documentary evidence regarding other accounts on Simonson's credit report, so the court will not grant summary judgment on this ground.

IQ Data's fifth and last reason is that Simonson was able to obtain funding for law school through other means. Specifically, she paid her tuition out of pocket in January 2022, and she obtained a student loan using her husband as a cosigner in May 2022. Neither side has submitted evidence regarding the financial effect of Simonson's efforts to obtain alternate

sources of funding. For example, did Simonson have to use a credit card at a higher interest rate to pay her tuition in January 2022? But even if Simonson ultimately paid the same amount or less than she would have paid if the law school had approved her initial application, that doesn't mean Simonson wasn't harmed. Simonson became burdened with a new legal obligation to her spouse when he cosigned the loan, and Simonson had to expend additional time and effort to obtain those other sources of funding. As will be discussed in the next section, lost time is an injury in fact and a compensable harm.

### 2. Lost time

IQ Data doesn't dispute that Simonson lost time in multiple ways in an attempt to mitigate the past and potential harm from the adverse account on her credit report. It is well established that even a small amount of lost time can be a compensable harm. *See Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 481 (7th Cir. 2019) (time lost reading a junk fax before discarding it is a concrete injury). For example, in *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963 (7th Cir. 2016), and *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 694 (7th Cir. 2015), the court held that plaintiffs who had been the victims of a data breach could recover for time spent resolving fraudulent charges and attempting to protect against future identity theft and fraudulent charges. The holdings in *Lewert* and *Remijas* apply here. Simonson lost time trying to remove an adverse account from her credit report and prevent the account from harming her in the future.

In its reply brief, IQ Data cites *Pierre v. Midland Credit Management, Inc.*, 29 F.4th 934 (7th Cir. 2022), for the proposition that lost time doesn't provide standing to sue. But *Pierre* is not instructive. In that case, the plaintiff sued a debt collector for sending her a letter offering her a "discount" on a debt after the statute of limitations had run on the debt. The letter stated

that the age of the debt meant that the defendant would not sue the plaintiff for the debt or take any other adverse action against her. The court held that the plaintiff did not have standing because she didn't make a payment in response to the letter or take any other action to her detriment. The court also concluded that the plaintiff's calls to the defendant to dispute the debt and to a lawyer for legal advice did not qualify as harm for standing purposes. *Id.* at 939.

*Pierre* did not purport to overrule *Remijas* or *Lewert*, and the cases are easily reconciled. The problem in *Pierre* was that the letter at issue neither harmed the plaintiff nor created a real risk of harm that the plaintiff needed to mitigate. So the time spent contacting the defendant and a lawyer were essentially self-inflicted injuries, which are not fairly traceable to the defendant. *See Remijas*, 794 F.3d at 694 (citing *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 416 (2013)). The court of appeals made this point again in *Baysal v. Midvale Indemnity Company*, in which it cited *Remijas* with approval but dismissed a claim for disclosure of driver's license numbers for lack of standing because the plaintiffs didn't trace any past or likely future harm to the disclosure. 78 F.4th 976, 977 (7th Cir. 2023). In this case, Simonson was attempting to mitigate harm that had already occurred (such as credit denials) and future harm that was likely to occur if adverse accounts remained on her credit report. That is sufficient to provide standing and provide a basis for awarding damages.

### 3.  Emotional distress

Simonson says that the Montana Apartments debt on her credit report caused her emotional distress in the form of lost sleep, anxiety, and an increased heart rate. IQ Data ignores that type of damages in its opening brief, so it forfeited the issue for the purpose of its

summary judgment motion. *Adams v. Bd. of Educ. of Harvey Sch. Dist. 152*, 968 F.3d 713, 716 (7th Cir. 2020).

In any event, IQ Data's argument in its reply brief fails. IQ Data quotes the statement from *Pierre* that "[p]sychological states induced by a debt collector's letter likewise fall short" for the purpose of proving standing to sue. 29 F.4th at 939. But *Pierre* did not hold that damages for emotional distress are not available under the FCRA or FDCPA. Both statutes allow recovery of "actual damages," 15 U.S.C. § 1681*o*, which include emotional distress, *see Wantz v. Experian Information Solutions,* 386 F.3d 829, 833 (7th Cir. 2004), *abrogated on other grounds by Safeco Ins. Co. of America v. Burr,* 551 U.S. 47, 56 n.8 (2007). The problem in *Pierre* was that the plaintiff was seeking damages for "confusion" and "worry" from a letter that did not otherwise harm the plaintiff or even threaten to harm her. In other words, the alleged emotional distress was not fairly traceable to the defendant's conduct. The court of appeals did not overrule previous case law holding that actual damages can include emotional distress.

The court will not preclude Simonson from offering evidence at trial of emotional distress caused by the credit denials and efforts to remove the inaccurate information from her credit report.[4]

## B. Fair Credit Reporting Act

Simonson asserts a claim under 15 U.S.C. § 1681s-2(b)(1), which requires a "furnisher" of credit information to conduct an investigation when it receives notice of a dispute from a

---

[4] The court of appeals has held in several cases that a plaintiff requesting damages for emotional distress must explain the circumstances of her injury in reasonable detail. *See, e.g., Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 609 (7th Cir. 2005); *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 971 (7th Cir. 2004). IQ Data doesn't raise this issue in its briefs, so the court won't consider the issue. But Simonson will have to comply with the rule at trial to support an award for emotional distress.

credit reporting agency about "the completeness or accuracy of any information" that the furnisher provided to the agency. The court of appeals has translated this provision into three elements: (1) the furnisher provided incomplete or inaccurate information to the credit reporting agency; (2) the furnisher didn't conduct a reasonable investigation of the disputed information; and (3) the furnisher would have determined that the disputed information was incomplete, inaccurate, or unverifiable if it had conducted a reasonable investigation. *See Frazier v. Dovenmuehle Mortgage, Inc.*, 72 F.4th 769, 775 (7th Cir. 2023).[5]

In this case, it's undisputed that IQ Data qualifies as a furnisher under the statute and that the information IQ Data provided—that Simonson owed a debt to Montana Apartments—was inaccurate. The sole question is whether IQ Data's investigation was reasonable. Reasonableness is determined based on the totality of circumstances. *Woods v. LVNV Funding, LLC*, 27 F.4th 544, 551 (7th Cir. 2022). Both parties assume that if the investigation was unreasonable, it follows that a reasonable investigation would have confirmed that IQ Data was reporting inaccurate account information or at least that the debt couldn't be verified.

Both parties contend that they are entitled to summary judgment on the issue of reasonableness.[6] But reasonableness "is a factual question normally reserved for trial" unless the defendant's procedures were reasonable (or unreasonable) "beyond question." *Westra v.*

---

[5] *Frazier* doesn't discuss information that can't be verified. But the FCRA does. If the furnisher cannot verify information, it must modify, delete, or block the information. 15 U.S.C. § 1681s-2(b)(1)(E); *see also Hinkle v. Midland Credit Management, Inc.*, 827 F.3d 1295, 1304 (11th Cir. 2016) ("[W]hen a furnisher is unable to verify the identity of an alleged debtor, we are persuaded by the parallel structure of §§ 1681s and 1681i that the appropriate response will be to delete the account or cease reporting it entirely.")

[6] IQ Data asks the court to disregard Simonson's motion for summary judgment because Simonson missed the deadline for filing such a motion. The court need not consider the timeliness of Simonson's motion because the court is denying the motion on other grounds.

*Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005). The court concludes that whether IQ Data conducted a reasonable investigation in this case is a question for the jury.

IQ Data's duty to investigate under § 1681s-2(b)(1) was not triggered until it received notice from Equifax that Simonson was disputing the debt. Section 1681s-2(b) applies when the furnisher receives notice of a dispute from a credit agency, not from the consumer herself. Section 1681s-2(a)(8) allows the consumer to file a dispute with the furnisher directly, but the consumer has no private right of action if the furnisher fails to take action in that situation. 15 U.S.C. § 1681s-2(c)(1). So the court will not consider whether IQ Data acted reasonably in the spring of 2021 when Simonson first told IQ Data about the identity theft.

Neither side states exactly when IQ Data received notice of the dispute from Equifax or any other credit agency. But Simonson first disputed the debt with credit agencies in August 2021, and the parties assume that IQ Data received notice around the same time and that Equifax forwarded all the information it received from Simonson to IQ Data, so the court will do the same. After it received notice from Equifax, IQ Data was required to consider all of the information that was reasonably available to it, regardless of whether that information came from Equifax, Simonson, or another source. *See Hinkle v. Midland Credit Management, Inc.,* 827 F.3d 1295, 1306 (11th Cir. 2016); *see also Humphrey v. Trans Union LLC,* 759 Fed. Appx. 484, 491 (7th Cir. 2019) (including information provided directly by the consumer in the court's evaluation of whether furnisher's investigation was reasonable).

As of August 2021, IQ Data had the following information: (1) verbal and written statements from Simonson that she was the victim of identity theft; (2) an incident report from the Phoenix Police Department; (3) the belief of an IQ Data representative who called two numbers on file for Simonson that Simonson's voice was different from the voice of the person

13

who answered the other number; and (4) a letter from Simonson on letterhead of a company in Duluth, Minnesota. In response, IQ Data sent Simonson a request for more information, including the name and telephone number of the officer who prepared the incident report, a copy of Simonson's ID, and proof of residency during the relevant time. Simonson did not directly respond to that letter.

*Woods* provides some support for a finding that IQ Data's August 2021 response was reasonable. In *Woods,* the court of appeals affirmed summary judgment in favor of a furnisher who ceased its investigation of a consumer's identify-theft claim after the consumer failed to respond to the furnisher's request for more information. 27 F.4th at 550–51. IQ Data relies heavily on *Woods*, but that case is not on all fours with this one, for multiple reasons.

First, the furnisher in *Woods* had affirmative evidence that its information was accurate. Specifically, the furnisher had a police report suggesting that the debt did in fact belong to the consumer. *Id.* at 550. IQ Data doesn't point to any information it had—other than the disputed information itself—that supported a finding that the debt belonged to Simonson. That is relevant because the FCRA's duty to investigate is on the furnisher, not the consumer. For this reason, at least one court has held that a consumer's failure to respond to a furnisher's request for information is relevant but not dispositive to the reasonableness question. *Hinkle*, 827 F.3d at 1306. That holding is consistent with *Woods*, which qualified its ruling by stating that furnishers do not have "license . . . to offload their § 1681s-2(b)(1)(A) investigation obligations to consumers by spamming them with requests for additional information." 27 F.4th at 551.

Second, unlike the plaintiff in *Woods*, Simonson filed more disputes about the debt and provided additional corroborating information after IQ Data sent the letter to Simonson asking for more information. Specifically, she filed disputes on August 21, September 4, and

November 21 in 2021, and on February 14 in 2022. Neither side explains what information Simonson provided with her August 21 and September 4 disputes, but her November 21 dispute included a copy of her Wisconsin driver's license and a police report from a Wisconsin county sheriff's office, and her February 14 dispute included a sworn affidavit that identified her Wisconsin address.

IQ Data points out that the driver's license was issued in 2016, so it didn't establish where Simonson was living in 2021. But the address on the driver's license matched the address in the Wisconsin police report and the affidavit, so there was some corroboration. And the police report itself described in detail the sheriff's office investigation, which also supported Simonson's claim. Specifically, the sheriff's office determined that the IP address for the apartment applicant was in Arizona, not Wisconsin, the phone number used for the rental agreement used an Arizona area code, and that the phone number had been disconnected. Dkt. 38-3, at 2–12.

IQ Data identifies no action that it took in response to the additional disputes. It did not contact the sheriff's office or follow up with Simonson in any way. The only action that IQ Data says it took after November 2021 was that it asked Montana Apartments for a copy of the lease, ledger, and rental application from Montana Apartments. But IQ Data doesn't explain how that information would help in confirming or rejecting Simonson's claim of identity theft. Simonson had already acknowledged that the debtor had used her information on the application, so there was no reason to believe that the information wouldn't match. Under these circumstances, a reasonable jury could find that IQ Data should have done more, and, if it had, it would have determined that the debt did not belong to Simonson or at least that it couldn't be verified.

15

IQ Data relies primarily on the fact that Simonson never provided proof of residence in the form of a utility bill, insurance bill or rental agreement showing Simonson's address during the relevant time period. But IQ Data did receive several pieces of evidence that Simonson had not rented an Arizona apartment. Her statements (including a sworn affidavit), her driver's license, the police reports, and her employer's letterhead all indicated that she did not live in Arizona. It is true that the information Simonson provided was not as definitive as the information that IQ Data had requested. But even if it was reasonable for IQ Data to determine that it needed more information, that doesn't mean that that IQ Data was entitled to do nothing after Simonson failed to respond to the August 2021 letter. A reasonable jury could find that IQ Data should have taken additional steps when Simonson continued disputing the debt and provided additional information.

Having said that, Simonson has not shown that the evidence is so lopsided that a jury would be compelled to find in her favor. As an initial matter, she cites no cases in which a court concluded that a furnisher's investigation was unreasonable as a matter of law. This is not surprising because plaintiffs have the burden of proof on this issue. Further, there is some evidence that IQ Data acted reasonably by promptly asking Simonson for information that could quickly and easily resolve the issue. The evidence of identity theft that IQ Data had in August 2021 was not so compelling that it would be unreasonable as a matter of law to ask Simonson for more definitive proof. Even after Simonson provided more information, the jury could find that IQ Data was entitled to rely on the fact that Simonson did not provide what IQ Data asked for.

Simonson says that she never received IQ Data's information request in August 2021, and she blames IQ Data for sending its letter to the wrong address. But IQ Data used the

address that Simonson provided (her employer's), so IQ Data can't be blamed for that. It appears that IQ Data omitted the employer's suite number on the envelope, which Simonson suggests is the reason the letter didn't reach her. But the court cannot say that the oversight rendered IQ Data's investigation unreasonable as a matter of law. So the court will deny both parties' summary judgment motions as they relate to liability on Simonson's claim under § 1681s-2.

IQ Data also seeks summary judgment on Simonson's request for punitive damages under the FCRA. IQ Data contends that Simonson hasn't adduced evidence that IQ Data's violation was willful (meaning knowing or reckless) as required to recover punitive damages. 15 U.S.C. § 1681n; *Humphrey v. Navient Solutions, Inc.*, No. 16-cv-370-jdp, 2020 WL 91007, at *2 (W.D. Wis. Jan. 8, 2020). Simonson doesn't respond to IQ Data's argument, so Simonson has forfeited that issue. *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016). The court will grant IQ Data's summary judgment motion on the issue of punitive damages.

## C.  Fair Debt Collection Practices Act

Simonson contends that IQ Data violated two similar FDCPA provisions by continuing to report the Montana Apartments debt. First, 15 U.S.C. § 1692e(2) prohibits a debt collector from making a "false representation" about the "legal status of any debt." Second, 15 U.S.C. § 1692e(8) prohibits a debt collector from "[c]ommunicating . . . to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." In this case, IQ Data did report that the Montana Apartments' debt was disputed, but Simonson contends that IQ Data violated

§§ 1692e(2) and 1692e(8) because reporting that Simonson may owe the debt was a false representation, and IQ Data knew or should have known that.

IQ Data doesn't dispute that its reporting was a false representation about the debt, but it seeks summary judgment on the claim under § 1692e(8) on the ground that it neither knew nor should have known that the debt did not belong to Simonson, and it seeks summary judgment on both claims based on an affirmative defense that its failure to determine that the debt didn't belong to Simonson was a "bona fide error" under 15 U.S.C. § 1692k(c). The court concludes that IQ Data isn't entitled to summary judgment on either ground.

As for whether Simonson knew or should have known that Simonson didn't owe a debt to Montana Apartments, the court will deny summary judgment for the same reason that it is denying summary judgment on the FCRA claim. The question whether IQ Data should have known that the debt didn't belong to Simonson overlaps substantially with the question whether IQ Data conducted a reasonable investigation. A reasonable jury could find that IQ Data should have and would have known that the debt didn't belong to Simonson if it had conducted a reasonable investigation.

As for the bona fide error defense, IQ Data must prove two things: (1) its alleged violation resulted from a bona fide error, and (2) it maintained procedures reasonably adapted to avoid any such error. *Ross v. Financial Asset Management Systems, Inc.*, 74 F.4th 429, 433–34 (7th Cir. 2023); *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 537 (7th Cir. 2005).[7] The court will assume for the purpose of IQ Data's motion that its alleged violation was a bona

---

[7] Case law refers to a third element that the violation was "not intentional," but that requirement is necessarily subsumed in the meaning of a "bona fide error," which is defined as "an error made in good faith; a genuine mistake, as opposed to a contrived mistake." *Kort*, 394 F.3d at 538. An intentional violation could not qualify as a good-faith error or genuine mistake.

fide error, but IQ Data hasn't shown as a matter of law that it had reasonable procedures to avoid the error.

In the cases in which the court of appeals has determined that a debt collector is entitled to the bona fide error defense, the defendant generally points to an employee error that could have been prevented had the employee followed company policy. *See, e.g., Ross*, 74 F.4th at 435 (employee failed to forward consumer dispute as directed by company policy); *Ewing v. MED-1 Solutions, LLC*, 24 F.4th 1146, 1155 (7th Cir. 2022) (employee accidentally forwarded consumer's letter to the wrong department); *see also Tolliver v. National Credit Systems, Inc.*, No. 20-cv-728-jdp, 2021 WL 4306056, at *4 (W.D. Wis. Sept. 22, 2021) (employee lost consumer's letter). That is not what IQ Data is contending in this case. Rather, IQ Data says that its employees did everything they were supposed to do, and it was appropriate for them to continue reporting the debt because Simonson had not provided proof of her address during the relevant time.

IQ Data's argument under § 1692k(c) is essentially the same argument that it made under § 1681-2(s): it conducted a reasonable investigation based on reasonable procedures for handling claims of identity theft. This argument fails because IQ Data doesn't identify how its procedures could have avoided the problem in this case. In fact, IQ Data doesn't provide any specifics about relevant procedures. Its proposed findings of fact include two paragraphs about its procedures for investigating claims of identity theft:

- "IQ Data has reasonable procedures in place regarding identity theft claims when presented by a consumer in keeping with the FDCPA, FCRA, UDAAP, along with all state and local laws." Dkt. 44, ¶ 29.

- "The Identity Theft Procedure provides that if IQ Data can determine a fraud has been perpetrated the account will be canceled back to the client as 'Fraud,' written confirmation of the cancellation will be provided along with the deletion of the consumer tradeline as necessary." *Id.*, ¶ 30.

These paragraphs explain what IQ Data does after it determines that fraud occurs, but they don't explain the procedures that IQ Data uses to determine *whether* fraud occurred.

Instead of identifying reasonable procedures, IQ Data blames Simonson for failing to respond to its August 2021 letter. The court has already rejected that argument because IQ Data received new disputes and new information from Simonson and Equifax after August 2021. IQ Data points to no procedure it had to evaluate that new information, except to say that its employees appropriately declined to stop reporting the debt because Simonson didn't provide adequate proof of residency. A reasonable jury could find that a policy of refusing to do anything unless the consumer provides one type of information, even after receiving new information that supports consumer's claim of identity theft, is not a reasonable procedure.

The court will deny IQ Data's motion for summary judgment on Simonson's claims under the FDCPA.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendant IQ Data International, Inc., Dkt. 28, is GRANTED as to the request for punitive damages under 15

U.S.C. § 1681n. IQ Data's motion is DENIED in all other respects. Plaintiff Nicole Simonson's motion for summary judgment, Dkt. 37, is DENIED.

Entered October 16, 2023.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge